2012 COA 108

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Hysear Don RANDELL, Defendant–Appellant.**

No. 09CA2396.

Colorado Court of Appeals, Div. II.

July 5, 2012.

Rehearing Denied Aug. 2, 2012.

John W. Suthers, Attorney General, John D. Seidel, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Walta LLC, Mark G. Walta, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge CASEBOLT.

¶1 Defendant, Hysear Don Randell, appeals the judgment of conviction entered on jury verdicts finding him guilty of multiple felonies in connection with a scheme to obtain fraudulent tax refunds and credits from the Colorado Department of Revenue (CDOR). He asserts that his convictions for twenty-six counts of theft by receiving must merge into four convictions under double jeopardy principles; that there was insufficient evidence to support his convictions for forgery, conspiracy to commit forgery, conspiracy to commit computer crime, and violation of the Colorado Organized Crime Control Act (COCCA); and that the prosecution made improper statements during closing argument.

¶2 We conclude that the aggregation provision of former section 18–4–410 (ch. 215, sec.11, § 18–4–410(7), 1999 Colo. Sess. Laws 797), in effect at the time of defendant's offenses, requires the theft by receiving counts to merge into five convictions. Therefore, we merge the twenty-six theft by receiving convictions into five and remand for resentencing and correction of the mittimus. We reject defendant's other contentions and affirm the judgment in all other respects.

## I. Background

¶3 Defendant, his girlfriend, and his wife diverted more than $11 million in fraudulent income tax refunds and credits from the CDOR to bank accounts and business entities controlled by defendant. The girlfriend, a supervisor in the CDOR Income Tax Section, devised several methods of generating fraudulent refunds and credits or transferring legitimate but unclaimed amounts from other taxpayers to defendant and his businesses.

¶4 As pertinent here, each method involved the girlfriend exploiting her access to the CDOR computer system to issue facially valid, but unauthorized, direct deposits or paper warrants in amounts ranging from several hundred to several hundred thousand dollars. Defendant endorsed and deposited some of the warrants into personal bank accounts and channeled the rest through more than a dozen entities created with the help of the girlfriend. Although several of the entities conducted legitimate businesses (a clothing store and an entertainment production company), they served primarily to distribute the proceeds of the fraud without arousing the suspicions of banking institutions.

¶5 A grand jury returned an indictment charging defendant with a pattern of racketeering activity in violation of COCCA, two counts each of computer crime and conspiracy to commit computer crime, seventeen counts of forgery, conspiracy to commit forgery, twenty-six counts of theft by receiving, conspiracy to commit theft by receiving, theft, attempted theft, conspiracy to commit theft, and conspiracy to commit embezzlement of public property, all occurring between August 1, 2005 and July 25, 2007. The indictment named the girlfriend and the wife as co-conspirators. The girlfriend, who had agreed to plead guilty to violating COCCA, testified against defendant at trial.

¶6 Following trial, a jury found defendant guilty on all charges except the substantive computer crime counts. This appeal followed.

## II. Theft by Receiving

¶7 Defendant asserts that he cannot be convicted of twenty-six counts of theft by receiving under ch. 215, sec. 11, § 18–4–410(7), 1999 Colo. Sess. Laws 797, because that statute required all thefts within a six-month period to be prosecuted as a single felony. He contends that more than four convictions for acts spanning approximately twenty months would result in multiple punishments for the same crime, violating double jeopardy principles. We agree that the relevant version of the statute requires multiple thefts by receiving to be aggregated into six-month units of prosecution; however, we conclude that defendant may stand convicted of five counts, not four.

### A. Standard of Review

¶8 The parties disagree concerning the appropriate standard of review, although both agree that defendant did not object in the trial court to the manner in which the theft by receiving counts were charged or sentenced. Defendant asserts that our review is de novo, but the People assert we should review only for plain error. We need

not resolve this disagreement, however, because the result would be the same under either standard.

## B. Law

¶ 9 "Multiplicity is the charging of the same offense in several counts, culminating in multiple punishments." *People v. Vigil,* 251 P.3d 442, 449 (Colo.App.2010) (quoting *Quintano v. People,* 105 P.3d 585, 589 (Colo. 2005)). Multiplicitous convictions cannot stand because they violate the constitutional prohibition against double jeopardy. *Id.* (citing *Woellhaf v. People,* 105 P.3d 209, 214 (Colo.2005)).

¶ 10 In *Roberts v. People,* 203 P.3d 513 (Colo.2009), the supreme court construed a previous version of section 18–4–401 defining the crime of theft in Colorado. The statute then provided:

> When a person commits theft twice or more within a period of six months without having been placed in jeopardy for the prior offense or offenses, and the aggregate value of the things involved is five hundred dollars or more but less than fifteen thousand dollars, it is a class 4 felony; however, if the aggregate value of the things involved is fifteen thousand dollars or more, it is a class 3 felony.

Ch. 314, sec. 10, § 18–4–401(4), 1998 Colo. Sess. Laws 1437.

¶ 11 The defendant in *Roberts* stole more than $27,000 from his employer over a period of twenty-seven months. Observing that "[s]ection 18–4–401(4) treats as a single theft all thefts committed by the same person in a six-month period," *Roberts,* 203 P.3d at 517–18, the court concluded:

> There can be little doubt that this language not only permits, but in fact requires, all thefts committed by the same person within a six-month period (except any for which jeopardy had already attached before he committed the others), to be joined and prosecuted as a single felony. On its face, this provision speaks to the scope of the crime the legislature intended to create—what we and the United

States Supreme Court have previously referred to as the "unit of prosecution."

*Id.* at 516.

¶ 12 Within several months of the *Roberts* decision, the General Assembly responded to it with a legislative declaration that its intent "was to allow, but not require, aggregation of multiple violations of [theft] statutes, committed within a period of six months, into a single offense for the purposes of determining the grade of offense." Ch. 244, sec. 1(a), § 18–4–401(4)(a), 2009 Colo. Sess. Laws 1099. Accordingly, the General Assembly amended the statute to provide:

> When a person commits theft twice or more within a period of six months, two or more of the thefts *may be aggregated* and charged in a single count, in which event the thefts so aggregated and charged shall constitute a single offense....

§ 18–4–401(4)(a), C.R.S.2011 (emphasis added). Notably, at the same time the legislature also amended the theft by receiving statute to allow—but not require—all such thefts within a six-month period to be aggregated and charged as a single offense. *See* § 18–4–410(7), C.R.S.2011.

¶ 13 Nevertheless, the *Vigil* division applied the six-month unit of prosecution set forth in *Roberts* to offenses arising before the 2009 amendments, concluding that two of the defendant's five theft convictions were multiplicitous and had to be merged. *Vigil,* 251 P.3d at 450–51. While acknowledging that "the legislature disavowed any intent to have created a mandatory unit of prosecution," the division declined to apply that declaration retroactively because "[a] legislative statement 'cannot control the interpretation of an earlier enacted statute.'" *Id.* at 449 (quoting *O'Gilvie v. United States,* 519 U.S. 79, 90, 117 S.Ct. 452, 136 L.Ed.2d 454 (1996)).

¶ 14 The supreme court applied similar reasoning in *Lucero v. People,* 2012 CO 7, ¶ 17, 272 P.3d 1063. The court concluded as a matter of law that "[a]s in *Roberts,* the statute in effect at the time of Lucero's acts provided that multiple thefts within a six[-]month period must be merged into a single theft conviction." *Id.* at ¶ 17.

### C. Application

#### 1. Merits

¶ 15 Here, defendant was convicted of twenty-six counts of theft by receiving under section 18–4–410, based on acts occurring between August 29, 2005, and April 12, 2007. Although the People note that no Colorado case has extended *Roberts* to theft by receiving, both parties acknowledge that the relevant language of section 18–4–410 was substantively identical to section 18–4–401(4) at the time of defendant's offenses. *See* ch. 215, sec. 11, § 18–4–410(7), 1999 Colo. Sess. Laws 797 ("When a person commits theft by receiving twice or more within a period of six months without having been placed in jeopardy for the prior offenses and the aggregate value of the things involved is five hundred dollars or more but less than fifteen thousand dollars, it is a class 4 felony; however, if the aggregate value of the things involved is fifteen thousand dollars or more, it is a class 3 felony."). "[A] term appearing in several places in a statutory text is generally read the same way each time it appears." *Cloer v. Sec'y of Health & Human Services,* 654 F.3d 1322, 1331 (Fed.Cir.2011) (quoting *Ratzlaf v. United States,* 510 U.S. 135, 143, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994); *see also Crandall v. City & County of Denver,* 238 P.3d 659, 662 (Colo.2010) ("Because the relevant language in both statutes is identical, we conduct one analysis.").

¶ 16 Notwithstanding the common language in both statutes, the People contend that the interpretation in *Roberts* should not apply here because the General Assembly subsequently clarified that it never intended to create a mandatory unit of prosecution for either type of theft. We disagree.

¶ 17 As noted above, "[a] legislative statement 'cannot control the interpretation of an earlier enacted statute.'" *Vigil,* 251 P.3d at 449 (quoting *O'Gilvie,* 519 U.S. at 90, 117 S.Ct. 452). Moreover, "[w]e cannot give effect to a provision that 'punishes as a crime conduct which was innocent when done, makes more onerous the punishment for a crime after its commission, or deprives a defendant of a defense that was available at the time the crime was committed.'" *Id.* (quoting *Woldt v. People,* 64 P.3d 256, 270 (Colo.2003)). As the *Vigil* division recognized, affirming convictions that were illegal when imposed based on subsequent legislation "would have the impermissible effect of increasing punishment retroactively." *Id.*

¶ 18 Courts presume that the legislature intends to change the law when it amends a statute. *People v. Covington,* 19 P.3d 15, 21 (Colo.2001). Although this presumption may be rebutted with a showing that the legislature only intended to clarify an ambiguity, *see id.,* we disagree that the legislative amendments here were merely clarifications. *See Novak v. Craven,* 195 P.3d 1115, 1122 (Colo.App.2008) ("[T]he mere invocation of the word 'clarify' does not necessarily overcome the presumption that a substantive change in the law operates only prospectively."). In any event, "even a clear indication of intent to clarify cannot dispositively establish the meaning of previous legislation." *Union Pac. R.R. Co. v. Martin,* 209 P.3d 185, 188 (Colo.2009).

¶ 19 Indeed, the *Roberts* court remarked that "[t]here can be little doubt" that the unamended section 18–4–401(4) imposed a mandatory unit of prosecution. *Roberts,* 203 P.3d at 516. A division of this court in *People v. Crawford,* 230 P.3d 1232, 1236 (Colo.App.2009), also perceived no ambiguity and characterized the 2009 amendments as a legislative "reversal" of *Roberts.*

¶ 20 Absent constitutional concerns, it is the General Assembly's prerogative to amend or repeal prior legislation to reflect the adoption of different policies. *See People v. Juvenile Court,* 893 P.2d 81, 89 (Colo. 1995). However, the legislature's power to abrogate case law remains subject to the constitutional principle that "unless intent to the contrary is shown, legislation shall apply only to those transactions occurring after it takes effect." *City of Colorado Springs v. Powell,* 156 P.3d 461, 464 (Colo.2007).

¶ 21 Here, although defendant's trial occurred in July 2009, after the legislature disavowed its intent to require a mandatory unit of prosecution for theft, *Roberts* was the authoritative construction of section 18–4–401 at the time of his offenses. It is undisputed that defendant was charged and convicted under the pre–2009 version of section 18–4–

410. It follows that *Roberts'* holding applies here, even if the 2009 amendments would now produce a different result.

¶ 22 Accordingly, we conclude as a matter of law that defendant's theft by receiving convictions under the pre-amended section 18–4–410 are subject to a six-month unit of prosecution.

## 2. Remedy

¶ 23 Defendant contends that he can only be convicted of four counts of theft by receiving under the *Roberts* analysis. Although we agree that his convictions must merge, we conclude that the facts here support five convictions.

■ ¶ 24 Pursuant to *Roberts*, "all thefts committed by the same person within a six-month period ... [must] be joined and prosecuted as a single felony." *Roberts*, 203 P.3d at 516. As the *Vigil* division observed, however:

> The unit of prosecution identified in *Roberts* is easy to apply if the defendant's thefts all occur within a single six-month period (the defendant may sustain only one theft conviction), or if the defendant's thefts are all separated by more than six months (each theft can support a separate conviction). But the issue is more complicated if the thefts may be grouped in various ways.

*Vigil*, 251 P.3d at 449. Therefore, "a reviewing court must employ the approach that will maximize the effect of a jury's verdict" to yield "as many convictions as possible." *Id.* at 450 (citing *People v. Rodriguez*, 914 P.2d 230, 285 (Colo.1996), and *People v. Glover*, 893 P.2d 1311, 1315 (Colo.1995)).

■ ¶ 25 Here, defendant contends that "[a]lthough the individual groupings are subject to some variation, the [theft by receiving] charges inevitably fall within four, distinct six-month time periods." The periods he identifies, however, appear to be based on calendar years, encompassing the second half of 2005, first half of 2006, and so on. But we do not perceive any indication in section 18–4–410(7) or the associated case law that each six-month unit of prosecution must conform to any portion of the calendar year. As the *Vigil* division observed, one could just as easily place the earliest and latest thefts into separate six-month periods, resulting in an additional conviction. *See id.*

■ ¶ 26 Accordingly, defendant may be convicted of one count of theft by receiving for the six-month period ending August 29, 2005. The second six-month period covers offenses from September 2005 through February 2006, while the third runs from March through August 2006. The fourth period covers offenses from September 2006 through February 2007, and defendant's thefts in April 2007 fall into a fifth period of their own. This grouping divides defendant's twenty-six counts of theft by receiving into five six-month units of prosecution consistent with *Roberts* while giving maximum effect to the jury's verdict. *See Vigil*, 251 P.3d at 450.

¶ 27 The remaining counts must merge into five convictions regardless of whether, as here, the associated sentences were imposed concurrently. *See Villafranca v. People*, 194 Colo. 472, 475, 573 P.2d 540, 542–43 (1978) (rejecting claim that the defendant suffered no prejudice from erroneous conviction resulting in concurrent sentence). On remand, the trial court shall resentence defendant on five counts of theft by receiving in a manner consistent with this opinion and amend the mittimus accordingly.

## III. Sufficiency of the Evidence

¶ 28 Defendant next challenges his convictions for forgery, conspiracy to commit forgery, conspiracy to commit computer crime, and violation of COCCA. Although he frames some of these contentions as questions of statutory interpretation, each claim is ultimately a challenge to the legal sufficiency of the evidence. We conclude that the evidence was sufficient to support each conviction.

## A. Standard of Review

■ ¶ 29 We review de novo whether the evidence is sufficient to support a conviction. *Dempsey v. People*, 117 P.3d 800, 807 (Colo. 2005).

■ ¶ 30 A defendant may challenge the sufficiency of the evidence on appeal without moving for a judgment of acquittal in the trial court. *People v. Garcia*, 2012 COA 79,

¶ 35, 296 P.3d 285; *People v. Peay,* 5 P.3d 398, 400 (Colo.App.2000). Accordingly, we reject the People's contention that the insufficient evidence claims defendant failed to raise in the trial court should only be reviewed for plain error.

¶ 31 "When assessing the sufficiency of the evidence in support of a guilty verdict, a reviewing court must determine whether any rational trier of fact might accept the evidence, taken as a whole and in the light most favorable to the prosecution, as sufficient to support a finding of the accused's guilt beyond a reasonable doubt." *People v. Robb,* 215 P.3d 1253, 1257 (Colo. App.2009) (quoting *People v. Sprouse,* 983 P.2d 771, 777 (Colo.1999)). This inquiry is guided by five well-established principles of law:

> First, the court must give the prosecution the benefit of every reasonable inference[ ] which might be fairly drawn from the evidence. Second, the determination of the credibility of witnesses is solely within the province of the jury. Third, the trial court may not serve as a thirteenth juror and determine what specific weight should be accorded to various pieces of evidence or by resolving conflicts in the evidence. Fourth, a modicum of relevant evidence will not rationally support a conviction beyond a reasonable doubt. Finally, verdicts in criminal cases may not be based on guessing, speculation, or conjecture.

*Sprouse,* 983 P.2d at 778 (citing *Kogan v. People,* 756 P.2d 945, 950 (Colo.1988)).

¶ 32 Where a sufficiency of the evidence argument turns on a question of statutory interpretation, we endeavor to effectuate the intent of the General Assembly, which is charged with defining criminal conduct and establishing the legal elements of a crime. *People v. Davis,* 2012 COA 56, ¶ 12, 296 P.3d 219 (citing *People v. Vecellio,* 2012 COA 40, ¶ 14, 292 P.3d 1004). We begin with the plain language of the statute, reading the words and phrases in context and construing them according to their common usage. *Id.* If the statutory language is clear and unambiguous, we apply it as written without resort to further rules of statutory analysis. *Id.*

## B. Forgery

¶ 33 Defendant asserts that his convictions for forgery and conspiracy to commit forgery are "legally unsustainable" because the warrants were genuine instruments, not false, and because tax refund warrants are not "written instrument[s] officially issued or created by a public office, public servant, or government agency" within the meaning of section 18–5–102(1)(e), C.R.S.2011. Although these arguments rest on both case law and statutory interpretation, defendant acknowledges that "[b]oth challenges essentially question the legal sufficiency of the evidence underlying the prosecution's theory of forgery." We conclude that the evidence was sufficient to support these convictions.

### 1. Law

¶ 34 "A person commits forgery, if, with intent to defraud, such person falsely makes, completes, alters, or utters a written instrument which is or purports to be, or which is calculated to become or to represent if completed . . . [several categories of documents]." § 18–5–102(1). Those documents include:

> (a) Part of an issue of money, stamps, securities, or other valuable instruments issued by a government or government agency; or
>
> . . .
>
> (c) A deed, will, codicil, contract, assignment, commercial instrument, promissory note, check, or other instrument which does or may evidence, create, transfer, terminate, or otherwise affect a legal right, interest, obligation, or status; or
>
> . . .
>
> (e) A written instrument officially issued or created by a public office, public servant, or government agency.

§ 18–5–102(1)(a), (c), (e).

¶ 35 Defendant asserts that a forgery conviction based on the uttering of an instrument "requires proof that the instrument itself was false or fictitious and that the accused knew that the instrument was false or fictitious." *People v. Rubanowitz,* 688 P.2d 231, 237 (Colo.1984); *see also Cameron v. People,* 170 Colo. 504, 505, 462 P.2d 606,

607 (1969) (reversing forgery conviction where defendant did not know instrument was false). He notes that the

¶ 36 supreme court has held that "[a] false statement of fact in an instrument which is itself genuine, by which another person is deceived and defrauded, is not forgery." *De Rose v. People,* 64 Colo. 332, 334, 171 P. 359, 360 (1918).

¶ 37 In light of the decision in *People v. Kovacs,* 2012 COA 111, 284 P.3d 186, in which a division of this court discussed legislative changes in the forgery statute occurring after the above cases were decided, we have serious doubts about the validity of defendant's contentions. But we need not directly address those contentions because we conclude that the evidence is sufficient to show that defendant is guilty, as a complicitor, for the forgery committed by the girlfriend.

### 2. Application—Girlfriend's Forgery

¶ 38 Here, the prosecution argued that defendant committed forgery by uttering fraudulent warrants issued by the girlfriend. In closing argument, the prosecutor contended that by signing and depositing those warrants with knowledge that he was not entitled to any funds, defendant was guilty of forgery as a principal.

¶ 39 However, the prosecutor also argued for complicitor liability, stating:

Complicity means a crime committed by someone else. Theft, forgery, computer crime, attempted theft, all of those crimes we have. And another person committed all or part of the crime.... The defendant aided and abetted, advised and encouraged. He provided the reason for it. He provided the accounts. He provided the routing numbers. He provided the LLC agreements. He provided the documentation to commit this theft. He is guilty as a complicitor on every single count and then some. But he is also guilty as a principal and you know it.

Similarly, the prosecutor argued that defendant's opening of bank accounts, deposits of warrants, and creation of corporate entities were overt acts in a conspiracy to commit forgery.

¶ 40 The jury received a general instruction on complicitor liability, consistent with section 18–1–603, C.R.S.2011, stating:

A person is guilty of an offense committed by another person if he is a complicitor. To be guilty as a complicitor the following must be established beyond a reasonable doubt:

1. A crime must have been committed.
2. Another person must have committed all or part of the crime.
3. The defendant must have had knowledge that the other person intended to commit all or part of the crime.
4. The defendant must have had the intent to promote or facilitate the commission of the crime.
5. The defendant must have aided, abetted, advised, or encouraged the other person in the commission or planning of the crime.

¶ 41 Giving the prosecution the benefit of every reasonable inference, *see Sprouse,* 983 P.2d at 778, we conclude that regardless of whether the jury believed defendant was guilty of forgery as a principal, it could have found him guilty as a complicitor based on the evidence and instructions presented at trial. The jury could have found from the girlfriend's testimony that she committed forgery by falsely making illegitimate tax refunds, or falsely altering legitimate ones, with intent to defraud the State of Colorado. *See* § 18–5–101(2), (4), C.R.S.2011 (defining "falsely alter" as "to change a written instrument without the authority of anyone entitled to grant such authority ... so that such instrument in its thus altered form falsely appears or purports to be in all respects an authentic creation of or fully authorized by its ostensible maker" and defining "falsely make" as "to make or draw a written instrument ... which purports to be an authentic creation of its ostensible maker, but which is not, either because the ostensible maker is fictitious or because, if real, he did not authorize the making or the drawing thereof").

¶ 42 Whether or not the resulting warrants were facially valid, the girlfriend had no authority to manipulate the CDOR computer system to issue fraudulent refunds. Al-

though defendant denied knowing the refunds were stolen, the jury could have credited conflicting testimony that he not only knew about the scheme, but actively promoted, aided, and abetted it by supplying the girlfriend with account numbers and creating entities to conceal the theft.

 ¶ 43 The verdict forms for the forgery counts do not distinguish between direct and complicitor liability, but there is no indication in the record that the jury rejected a complicity theory. Complicity is not a separate and distinct offense under Colorado's criminal code and need not be specified in the charging document to support a conviction. *People v. Jimenez*, 217 P.3d 841, 871 (Colo.App.2008).

¶ 44 A similar line of reasoning supports defendant's conviction of conspiracy to commit forgery.

> A person commits conspiracy to commit a crime if, with the intent to promote or facilitate its commission, he agrees with another person or persons that they, or one or more of them, will engage in conduct which constitutes a crime or an attempt to commit a crime, or he agrees to aid the other person or persons in the planning or commission of a crime or of an attempt to commit such crime.
>
> ... An overt act in pursuance of that conspiracy [must be] proved to have been done by him or by a person with whom he conspired.

§ 18–2–201(1)–(2), C.R.S.2011.

 ¶ 45 To establish a conspiracy, there need only be circumstantial evidence indicating that the conspirators, by their acts, pursued the same objective, with a view toward attaining that objective. *People v. Scearce*, 87 P.3d 228, 232 (Colo.App.2003).

¶ 46 For reasons discussed above, the evidence here was sufficient to establish that defendant agreed to aid the girlfriend's commission of forgery and engaged in overt acts toward that objective by supplying account numbers, depositing warrants, and creating various entities to receive and distribute stolen funds.

### 2. Application—Section 18–5–102(1)(e)

¶ 47 Defendant also contends that he cannot be convicted of forgery under section 18–5–102(1)(e) because tax refund warrants are more accurately described as "checks" or "other valuable instruments issued by a ... government agency" under sections 18–5–102(1)(a) and (c). The People characterize this argument as a *"Bagby* claim" involving conduct that falls under both a general and a specific statute. *See People v. Bagby*, 734 P.2d 1059, 1061–62 (Colo.1987). Defendant, however, asserts that the essence of his claim is that "each of section 18–5–102(1)'s subparts addresses discrete classes of forged instruments," and "the jury was instructed on a specific method of forgery that does not encompass the type of instruments—namely, checks or warrants—at issue here." We reject defendant's contention.

¶ 48 The indictment charged defendant under subsections (a), (c), and (e) of the forgery statute. For reasons that are not clear from the record, however, the jury was only instructed on section 18–5–102(1)(e), which addresses forgery of "[a] written instrument officially issued or created by a public office, public servant, or government agency."

¶ 49 Defendant asserts that the reported case law "confirms that section 18–5–102(1)(e) typically has been applied in situations where the forged document was a governmentally-created or -issued instrument with no monetary value." He contends that "[t]he substance and structure of section 18–5–102 strongly suggest that the legislature did not intend subsection (1)(e) to apply in situations where the government-created or -issued instrument in question is either a check or some other instrument with an established monetary value." Defendant also invokes rules of statutory construction to argue that the subparts of section 18–5–102(1) would be rendered meaningless or superfluous if not interpreted as mutually exclusive.

 ¶ 50 Our inquiry, however, is not how section 18–5–102(1)(e) typically has been applied, but whether the evidence was sufficient to support defendant's conviction under that section. If a single transaction gives rise to the violation of more than one statute, the prosecution may determine under which statute or statutes to charge the defendant. *People v. Blue*, 253 P.3d 1273, 1277 (Colo. App.2011).

¶ 51 As noted, when a sufficiency of the evidence claim turns on statutory interpretation, we must begin with the plain language of the statute itself. *See Davis,* ¶ 12. If the statutory language is clear and unambiguous, we apply it as written without resort to further rules of statutory analysis. *See id.*

■ ¶ 52 However else a tax refund warrant might be characterized, it fits within the plain language of section 18–5–102(1)(e). *See Black's Law Dictionary* 1724 (9th ed.2009) (defining "warrant" as "[a]n order by which a drawer authorizes someone to pay a particular sum of money to another" and "treasury warrant" as "[a]n order in the form of a check on which government disbursements are paid"). Regardless of its monetary value, a warrant refunding state income taxes is, quite literally, "[a] written instrument officially issued or created by a public office, public servant, or government agency." § 18–5–102(1)(e).

¶ 53 Defendant disputes this interpretation on the ground that other subsections specifically refer to financial instruments and more accurately fit the facts of this case. However, we need not resort to rules of statutory construction or determine which subsections of the statute are more or less specific than others. Whether or not other subsections apply to state warrants, the only question here is whether a rational jury could have found each element of section 18–5–102(1)(e) was proved beyond a reasonable doubt. *See Robb,* 215 P.3d at 1257. We conclude that the evidence was sufficient to support the jury's verdict.

### C. Computer Crime

¶ 54 Defendant next asserts that he cannot be convicted of conspiracy to commit computer crime when the same evidence led the jury to acquit him of the substantive offense. This argument implicates the "inconsistent verdict rule" set forth in *Robles v. People,* 160 Colo. 297, 301, 417 P.2d 232, 234 (1966), and codified at section 18–2–206(2), C.R.S. 2011. Because the jury heard evidence of a conspiracy separate and distinct from the evidence supporting the substantive elements of computer crime, we conclude that the verdicts are consistent.

### 1. Law

¶ 55 As pertinent here, a person commits computer crime if the person knowingly

(b) Accesses any computer, computer network, or computer system, or any part thereof for the purpose of devising or executing any scheme or artifice to defraud; or . . .

(d) Accesses any computer, computer network, or computer system, or any part thereof to commit theft.

§ 18–5.5–102(1)(b), (d), C.R.S.2011.

¶ 56 As noted above, a person commits conspiracy if, with the intent to promote or facilitate the commission of a crime, he agrees with another person to engage in conduct that constitutes a crime or agrees to aid the other person in the planning or commission of a crime, and performs an overt act toward attaining that objective. § 18–2–201(1)–(2).

¶ 57 However, pursuant to section 18–2–206(2):

A person may not be convicted of conspiracy to commit an offense if he is acquitted of the offense which is the object of the conspiracy where the sole evidence of conspiracy is the evidence establishing the commission of the offense which is the object of the conspiracy.

This rule reflects the principle that "[t]he jury cannot be permitted to believe the testimony for the purposes of the conspiracy and disbelieve it for purposes of the substantive crime." *Scearce,* 87 P.3d at 232 (quoting *Hughes v. People,* 175 Colo. 351, 354, 487 P.2d 810, 812 (1971)).

■ ¶ 58 The inconsistent verdict rule, however, is

premised on the existence of only one fund of evidence which is utilized to prove both the substantive offense and conspiracy charge. On this basis, if a jury disbelieves this evidence or has a reasonable doubt that it is sufficient to prove the substantive offense, it logically follows that it is likewise unbelievable or insufficient to support a verdict of guilty to the conspiracy charge.

Thus, the basic reason for the ... rule disappears when the evidence can be segmented or is different as to both offenses. *Id.* (quoting *Armijo v. People,* 170 Colo. 411, 413–14, 462 P.2d 500, 501 (1969)). Thus, if evidence in the record separate and distinct from that supporting the commission of the substantive crime implicates the defendant in the conspiracy, the jury may properly acquit on the substantive charge, yet convict on the conspiracy. *Id.*

 ¶ 59 In determining whether some separate and distinct evidence exists, we may consider any evidence other than that concerning the commission of the substantive crime itself. *Id.* As an appellate court, our duty is to reconcile and uphold verdicts if the evidence so permits. *Id.* If the verdicts are consistent in any view of the evidence, the presumption is that the jury took that view. *Id.; see also People v. Hood,* 878 P.2d 89, 92 (Colo.App.1994) ("Every presumption is in favor of the verdict.").

### 2. Application

 ¶ 60 Defendant asserts that his prosecutions for computer crime and conspiracy to commit computer crime arose from the same fund of evidence, specifically his text, e-mail, and telephone messages to the girlfriend, and his incorporation of business entities to conceal fraudulent refunds. At some level of abstraction, however, every criminal prosecution rests on a single "fund of evidence." It does not follow that the evidence must support conviction on all charges or none at all. The purpose of the inconsistent verdict rule is to prevent *inconsistency,* not the consideration of one set of facts for multiple purposes.

¶ 61 The prosecution charged defendant under subsections (b) and (d) of the computer crime statute. Consequently, the prosecution had to prove that defendant accessed a computer for the purpose of devising or executing a scheme to defraud, *see* § 18–5.5–102(1)(b), or accessed a computer to commit theft, *see* § 18–5.5–102(1)(d). During closing argument, a prosecutor contended that defendant was guilty under both provisions, stating:

> [Defendant] gave [the girlfriend] the bank and accounting records either through text mail [sic], computer, e-mail. Computer

crime. He knew that money was stolen. He knew he never earned it. He just wanted to spend it. Sign here. Guilty. Computer crime. Again, you have different ways of proving it. Complicity or direct. He e-mailed her stuff. He sent her stuff. Or she did. He knew it. That's the only way you accomplish a theft like this. Artifice to defraud. This is clearly an artifice to defraud the State of Colorado.

Thus, the prosecution's theory of liability for computer crime was that defendant himself used text messages and e-mails to communicate requests for money and account information to the girlfriend. Complicitor liability, by contrast, would require proof that defendant intentionally aided and abetted the girlfriend's commission of computer crime. *See* § 18–1–603.

¶ 62 While defendant's conspiracy conviction may be based upon some similar facts relevant to the computer crime charge, we disagree that it arises from an inconsistent view of the evidence. For one thing, none of the statutory elements of computer crime involves opening bank accounts or creating entities to receive stolen funds. Accordingly, such acts are "evidence other than that concerning the commission of the substantive [computer] crime." *Scearce,* 87 P.3d at 232. The jury could have found that defendant did not "access a computer" within the meaning of the statute by merely sending electronic communications. It also could have concluded that the girlfriend alone committed computer crime without sufficient aid from defendant to result in complicitor liability. None of those findings would preclude defendant's conviction as a conspirator.

¶ 63 Moreover, acquittal on the substantive counts would not require the jury to believe testimony for the purposes of the conspiracy and disbelieve it for purposes of the crime itself. *See id.* The jury could believe that defendant engaged in every act described above while nevertheless harboring a reasonable doubt that those acts violated section 18–5.5–102(1)(b) or (d). "[T]he basic reason for the [inconsistent verdict] rule disappears when the evidence can be segmented or is different as to both offenses." *Id.* (quoting *Armijo,* 170 Colo. at 413–14, 462 P.2d at 501).

¶ 64 There also is no inherent inconsistency in the jury's conclusion that defendant was a conspirator but not a complicitor. The essence of complicity is to "punish for *participation* in the criminal act." *Hood*, 878 P.2d at 92 (quoting *People v. Shannon*, 189 Colo. 287, 290, 539 P.2d 480, 482 (1975)). By contrast, "the essence of the crime of conspiracy is an illegal *agreement* or combination plus an overt act in furtherance of that agreement." *Id.* (citation omitted). "The overt act need not be criminal in nature, if conspired separately and apart from the conspiracy." *United States v. Fell*, 511 F.3d 1035, 1041 (10th Cir.2007) (quoting CJI–Crim. 8(1) Definitions (1993)).

¶ 65 Thus, a rational jury could find that defendant's creation of entities and communications of account information were overt acts in a conspiracy to commit computer crime even if they were not criminal acts in themselves. Accordingly, defendant was properly convicted of conspiracy to commit computer crime.

### D. COCCA

¶ 66 Defendant asserts that his COCCA conviction cannot stand because there was insufficient evidence that he engaged in a "pattern of racketeering activity" under section 18–17–103(3), C.R.S.2011. Specifically, he contends that the predicate acts alleged by the prosecution were not "related to the conduct of the enterprise" within the meaning of the statute. We disagree.

#### 1. Law

¶ 67 Pursuant to COCCA, "[i]t is unlawful for any person employed by, or associated with, any enterprise to knowingly conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity." § 18–17–104(3), C.R.S. 2011. COCCA defines relevant terms as follows:

(2) "Enterprise" means any individual, sole proprietorship, partnership, corporation, trust, or other legal entity or any chartered union, association, or group of individuals, associated in fact although not a legal entity, and shall include illicit as well as licit enterprises and governmental as well as other entities.

(3) "Pattern of racketeering activity" means engaging in at least two acts of racketeering activity which are related to the conduct of the enterprise....

§ 18–17–103, C.R.S.2011. "Racketeering activity" is defined broadly to include theft, theft by receiving, forgery, computer crime, and other offenses not at issue here. *See* § 18–17–103(5)(b)(II)(IV), C.R.S.2011. Thus, "a 'pattern of racketeering activity' can be established under COCCA's section 18–17–103(3) simply by proving at least two acts of racketeering activity, as defined in section 18–17–103(5), that are *related to the conduct of the enterprise.*" *People v. Chaussee*, 880 P.2d 749, 758 (Colo.1994) (emphasis supplied).

¶ 68 In *Chaussee*, two defendants participated in an enterprise involving mail fraud, wire fraud, theft, forgery, and perjury. *Id.* at 760. While one defendant submitted false documents to the prosecution during the initial investigation of the enterprise, the second defendant forged documents, altered physical evidence, and perjured himself during the discovery phase in a civil action filed pursuant to the Colorado Consumer Protection Act approximately eight months after the enterprise ended. *Id.* at 760–61.

¶ 69 The supreme court held that only the first defendant's forgeries could be predicate acts in a "pattern of racketeering activity" under COCCA, "because through the act of forgery[,] the defendant sought not only to avoid liability but also to protect the integrity of the ongoing enterprise." *Id.* at 760. The second defendant's misconduct, by contrast, "was merely to protect himself from personal liability" after the enterprise was "dormant and apparently abandoned." *Id.* at 761. Consequently, the court observed:

The purpose of these alleged crimes committed during the course of discovery in the civil case was self-protection. [The second defendant] was not "enabled" by his position within the enterprise to commit these acts of discovery misconduct, nor were such acts related to activities of the enterprise, which had already ceased to do business.

*Id.*

¶ 70 Thus, *Chaussee* sets forth the general rule that predicate acts in a pattern

of racketeering activity must "protect the integrity of the ongoing enterprise" and be "related to the conduct of the enterprise." *Id.* at 760–61. Acts that merely protect a defendant's personal interests or attempt to "cover his tracks" are not sufficiently related to the conduct of the enterprise for liability under COCCA. *Id.*

### 2. Application

¶ 71 Here, the indictment defined the alleged enterprise as more than a dozen corporate and other entities created by defendant and the girlfriend to receive fraudulent tax refunds. Although several of the entities also conducted legitimate business, most were "shell" or "dummy" firms with no purpose other than to conceal the fraud. The prosecution alleged that defendant committed numerous predicate acts in support of this enterprise, including theft, theft by receiving, computer crime, and forgery.

¶ 72 Although the prosecution argued at trial that the enterprise extended beyond the entities to include defendant, the girlfriend, and the wife themselves, the indictment only names defendant's businesses. Defendant asserts that any expansion in the scope of the enterprise would amount to an impermissible constructive amendment of the charging instrument. *See United States v. Weissman,* 899 F.2d 1111, 1115–16 (11th Cir.1990). Consequently, we limit our analysis to the enterprise defined in the indictment, and we need not decide whether consideration of the individuals involved would amount to a constructive amendment.

■■■ ¶ 73 Because the indictment sets forth a limited definition of the alleged enterprise, defendant argues that he cannot be convicted under COCCA for merely creating corporations or similar entities to shield himself from personal liability. He argues that, "for the most part, these entities conducted no business whatsoever," so that his conduct could not have related to any "enterprise" beyond his own interest in receiving money without getting caught. Under defendant's reading of *Chaussee,* conduct that merely "facilitate[s] the perpetration of the fraudulent scheme" does not sufficiently relate to the conduct of the enterprise itself.

¶ 74 We disagree with this interpretation. As the People note, "[t]here is no authority under either COCCA or [the federal Racketeer Influenced and Corrupt Organizations (RICO) Act] for the idea that the enterprise must have legitimate 'conduct' in addition to conduct stemming from a COCCA defendant's racketeering activities." To the contrary, the statutory definition of "enterprise" explicitly includes "illicit as well as licit enterprises." § 18–17–103(2). We reject defendant's argument to the extent he asserts that a criminal enterprise must have some broader purpose beyond commission of the crime itself.

■■■ ¶ 75 Moreover, we do not read *Chaussee* to suggest that any act that advances a defendant's personal interests cannot be a COCCA predicate as a matter of law. The *Chaussee* court merely held that COCCA does not apply to acts intended solely to avoid personal liability after the enterprise has disbanded or ended. *See Chaussee,* 880 P.2d at 761. To some extent, every crime advances the perpetrator's own interests, but it does not follow that such acts can never relate to a "pattern of racketeering activity" under section 18–17–103(3). Furthermore, it is in every criminal's interest not to be caught, and so "self-protection" and maintaining "the integrity of the ongoing enterprise" are not necessarily mutually exclusive.

■■■ ¶ 76 However the enterprise here is defined, the object was to obtain fraudulent tax refunds and credits from the CDOR without being detected. The entities named in the indictment facilitated this scheme by allowing defendant to receive stolen money without arousing suspicion through large personal deposits. The fact that the predicate acts primarily enriched defendant does not mean the other co-conspirators had no interest in the enterprise. Although the corporate entities helped "cover [defendant's] tracks," *see Chaussee,* 880 P.2d at 761, they also protected the ongoing enterprise by diverting suspicion away from the girlfriend and the wife and allowing them to maintain the scheme for their own reasons.

¶ 77 Defendant's predicate acts were "related to the conduct of the enterprise" be-

cause they channeled stolen money through corporate and other entities set up specifically for that purpose. The fact that those entities shielded defendant from personal liability under principles of entity law does not mean they cannot also function as a COCCA enterprise where, as here, the entities are an integral part of the fraud. Unlike in *Chaussee*, defendant's acts occurred while the enterprise was ongoing, and they were directly related to the "activities of the enterprise," whether or not those activities included legitimate business. *See id.*

¶ 78 Accordingly, the evidence was sufficient to support defendant's COCCA conviction.

### IV. Prosecutorial Misconduct

¶ 79 Last, defendant asserts that the trial court erroneously allowed the prosecution to argue that he "stole from" the jury and "spent [jurors'] money" by defrauding Colorado taxpayers. He contends that such statements amounted to an improper "golden rule" argument encouraging jurors to imagine themselves as victims. We conclude that, although the prosecution's comments were improper, they did not undermine the fundamental fairness of this trial, where misappropriation of public funds was a central issue.

### A. Standard of Review

¶ 80 Defendant asserts that his objection directly following the conclusion of the prosecution's closing argument was sufficient to preserve this issue for appellate review. The People disagree. We conclude that only plain error review is available.

¶ 81 During a recess after the prosecution's closing argument, the following exchange occurred in a bench conference:

[Defense counsel]: In [the prosecutor's] rebuttal argument, I would ask if he could refrain from using the words "our money" [and] ["h]e stole from us["].... I think it is getting close to basically asking the jury to be placed in the shoes of the victim and I ask that they not go there.

[The prosecutor]: Unfortunately it is there whether you want it or not. It is the State of Colorado's money. This is a jury sworn in the State of Colorado, Denver District Court. I understand your concern but

unfortunately there is no other way to do it.

The Court: I think the jury as taxpayers can distinguish it wasn't taken from them individually, more of a joint—where we all put money into a big bucket, if you will, and some of that money was taken out. And it can't be attributable to Juror No. 1, 2 or 3. I think they are certainly aware of that. I don't think it is any additional prejudice.

[Defense counsel]: Your Honor, I didn't jump up and object. Just for the record, I want to make my objection here that I think it is coming close and for the record that's all. Thank you.

¶ 82 We conclude that counsel's comment lodged no specific objection and was not sufficiently contemporaneous to preserve the issue for harmless error appellate review.

¶ 83 Objections must be both specific and timely. *People v. McNeely*, 222 P.3d 370, 374 (Colo.App.2009). "It does not suffice to give trial courts a post-hoc opportunity to consider an alleged error." *Id.* at 374–75. Thus, "a challenge is unpreserved and thereby forfeited (subject only to plain error review) unless it is made in time for the trial court to avoid the alleged error." *Id.* at 374.

¶ 84 Here, defense counsel did not make specific or timely objections to the statements. Instead, he ambiguously asserted, during a recess, that the prosecution was "getting close" to an improper argument. Moreover, defendant did not request that the jury be instructed to disregard past statements, but merely asked the prosecutor to "not go there" in his rebuttal. Whether or not the prosecution raised the same "theme" during rebuttal, as defendant now argues, he did not make any objection at trial.

¶ 85 We are not persuaded otherwise by *People v. Dunlap*, 975 P.2d 723, 759 n. 39 (Colo.1999), in which the defendant moved for a mistrial based on an inappropriate remark in the prosecution's opening statement after the jury had been excused. There, the challenged comment was the final remark in the opening statement and the defense lodged its objection immediately afterward,

leading the court to review it as though it were contemporaneous. Here, however, defense counsel had multiple opportunities to object during the prosecution's closing argument but waited until a recess, and even then failed to make a specific objection or argument or to request a curative instruction.

¶ 86 Accordingly, we review defendant's unpreserved contention under a plain error standard. *See Lehnert v. People,* 244 P.3d 1180, 1184–85 (Colo.2010). "Plain" in this context is synonymous with "clear" or "obvious." *Id.* at 1185. Plain error is "so clear-cut, so obvious, a competent [trial] judge should be able to avoid it without benefit of objection." *People v. O'Connell,* 134 P.3d 460, 464 (Colo.App.2005) (quoting *United States v. Turman,* 122 F.3d 1167, 1170 (9th Cir.1997)). Such error requires reversal only if, after a review of the entire record, a court can conclude with fair assurance that the error so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *See Lehnert,* 244 P.3d at 1185.

### B. Law

¶ 87 A "golden rule" argument is one that asks jurors to place themselves in the victim's position. *People v. Munsey,* 232 P.3d 113, 123 (Colo.App.2009). "Such arguments are improper in the guilt phase of a criminal proceeding because they encourage the jury to decide the case based on personal interest and emotion rather than on a rational assessment of the evidence." *Id.; see also United States v. Palma,* 473 F.3d 899, 902 (8th Cir.2007) ("Remarks invoking the individual pecuniary interests of jurors as taxpayers are universally viewed as improper."); *United States v. Blecker,* 657 F.2d 629, 636 (4th Cir.1981) ("[A]ppeals to the pecuniary interests of jurors are patently improper.").

¶ 88 The defendant in *Munsey* was a public school executive charged with theft and embezzlement of money from the school district. 232 P.3d at 117–18. During closing argument, the prosecutor asked jurors to think of themselves as victims of those crimes, adding:

> This is a very serious and very important matter to all of us, to you as citizens, to them as defendants, to the people of the

State of Colorado. Think about that when you think about your tax money in this district.

*Id.* at 123. The *Munsey* division held that while the prosecutor's comment was "certainly inappropriate," it did not rise to the level of prejudicial error. *Id.* at 124. The division observed:

> The jurors knew they were taxpayers and that their tax money was at issue. Defendant does not allege any other prosecutorial misconduct during closing argument, and this comment was an isolated portion of the prosecution's closing. Taken in light of the record as a whole, it is unlikely that this comment substantially influenced the verdict.

*Id.; see also Palma,* 473 F.3d at 903 (given strength of government's case, court did not abuse discretion by declining to grant a mistrial following prosecution's improper appeal to jurors as taxpayers).

### C. Application

¶ 89 Defendant cites nine instances during closing argument where the prosecutor made statements such as:

- "[Defendant] is a thief and he stole from us."
- "[Defendant] spent your money."
- "[Defendant knew the girlfriend] controlled our tax money, millions upon millions of dollars."
- "[Defendant] [o]btained or exercised control over money, anything of value, property of another. We are another, ladies and gentlemen. We are another. We are the State of Colorado."
- "We know we all pay taxes every year and [defendant] knew it as well. So every year you were paying it you were going to pay for him. Hold him accountable and we'll pay for him."
- "[Defendant] was defrauding us."
- "Hold this man accountable for what he did to us, to the State of Colorado. He is guilty."

¶ 90 During rebuttal, the prosecutor reiterated that the fraudulent refunds "were coming from the pot known as the State of Colorado and from each and every one of its citizens," and that defendant conspired "to

illegally receive from the State of Colorado and its citizens 11 million dollars[,] depriving us of that money."

¶ 91 In light of *Munsey,* we agree that these arguments were inappropriate. In a case where misappropriation of public funds played a role in nearly every charge, however, we are not persuaded that the quoted statements had the effect of appealing to the juror's pecuniary interests as taxpayers. In any event, we disagree that the error requires reversal.

¶ 92 A true "golden rule" argument invites jurors to put themselves in the place of the victim and imagine that the defendant wronged them personally, thereby inflaming passions and prejudice. *See Dunlap,* 975 P.2d at 758 ("Like remarks aimed at jurors' biases, golden rule arguments in the guilt phase of a criminal trial are impermissible digressions from the evidence."); *Munsey,* 232 P.3d at 123. Here, however, the prosecutor merely emphasized the inherent nature of the charges: the theft of undeserved tax refunds and credits is ultimately a theft from all taxpayers. This point was consistent with the evidence presented at trial and not a superfluous appeal to emotion. *See Dunlap,* 975 P.2d at 759 (disapproving of prosecutor's remark encouraging jury to "memorialize or pay tribute to the victims by its verdict").

¶ 93 As the trial court noted, reasonable jurors could distinguish between money that was "taken from them individually" and money contributed into a "big bucket" through taxation. Indeed, the prosecution argued that defendant stole from "each and every one of [Colorado's] citizens," not the jurors in particular. No rational jury could convict defendant out of its own pecuniary interest here because the verdict would have no effect on jurors' personal wealth. The prosecution's comments did not encourage jurors to assume a role more hostile to defendant or sympathetic to other victims than the role they already occupied as taxpayers and citizens of Colorado.

¶ 94 Moreover, the prosecutor's language tracked the elements of the charges against defendant, focusing the argument on evidence rather than emotion. *See, e.g.,* § 18–4–401(1)(a) (a "person commits theft when he *knowingly obtains or exercises control* over

anything of value *of another* " and "[i]ntends to *deprive the other person* permanently of the use or benefit of the thing of value") (emphasis added). The evidence against defendant was overwhelming, *see Palma,* 473 F.3d at 903, and established that he knowingly obtained fraudulent refunds and credits from the state, permanently depriving taxpayers of the benefit of that money. As in *Munsey,* the jurors already knew their tax money was at issue, and so it is unlikely that the prosecutor's comments substantially influenced their verdict. *See Munsey,* 232 P.3d at 124.

¶ 95 Accordingly, the prosecution's comments did not undermine the fundamental fairness of defendant's trial or cast serious doubt on the reliability his convictions. *See Lehnert,* 244 P.3d at 1185. Although such statements were "certainly inappropriate," *see Munsey,* 232 P.3d at 124, they were not plain error.

¶ 96 In summary, the judgment is vacated to the extent that defendant's twenty-six convictions for theft by receiving are merged into five convictions, and the case is remanded for resentencing on those five convictions and for correction of the mittimus. The judgment is affirmed in all other respects.

Judge GRAHAM and Judge FURMAN concur.